UNITED STATES DISTRICT COURT

DISTRICT OF CONNECTICUT

UNITED STATES OF AMERICA :

vs. : CRIMINAL NO. 3:15CR32(JAM)

MIGUEL TORRES : May 15, 2015

MEMORANDUM IN AID OF SENTENCING

Miguel Torres is scheduled to appear before the Court on May 27, 2015 to be sentenced for his crime of persuading a minor to engage in unlawful sexual activity. At the age of 45, Mr. Torres has no prior criminal convictions, and the approximately 21 months he has spent in jail on this offense is the longest and only period of incarceration he has ever served. The entire period of incarceration has been served in segregation for Mr. Torres' protection, and he has been unable to participate in any prison programming, in spite of his intense desire to participate in programming to better himself. He has received threats while incarcerated and will likely need to be incarcerated in protective custody and/or segregation for the foreseeable future, which will make his time served even more punitive. Mr. Torres has a consistent record of employment and has a record of being a supportive and loving father. His wife continues to support him and plans to continue to support him through his incarceration. Mr. Torres has demonstrated a genuine desire to rehabilitate himself while incarcerated and plans to take advantage of every possible counseling, vocational, and educational opportunity. For all of these reasons and for the reasons discussed herein, we respectfully request that the Court sentence Mr. Torres to 10 years' incarceration, the mandatory minimum sentence in this case.

## I. History and Characteristics of Miguel Torres

Miguel Torres is 45 years old. He has no criminal convictions and prior to his arrest in this case never spent a day of his life in jail.

Mr. Torres' father was largely absent from his life, and he was raised primarily by his mother. The absence of his father has been painful for Mr. Torres for most of his life, and it has had a profound impact on him. Although his mother provided a loving home, the family lived a humble life, and

depended upon state assistance for survival. Mr. Torres grew up principally in Puerto Rico and New York, in a then-crime-ridden Brooklyn neighborhood. While living in Brooklyn, at around the age of 6, Mr. Torres was inappropriately sexually touched by a female babysitter on approximately three occasions. Mr. Torres recalls these incidents with great pain and embarrassment. He feels that this was the worst experience in his life, and the memories of that experience have remained with him to this day.

As a child, Mr. Torres attended school in Brooklyn and Puerto Rico. He enjoyed playing sports and was active in extracurricular sports. Because he had moved between schools in Brooklyn and Puerto Rico, Mr. Torres had to be held back a grade. In addition, because he had lived in New York for so long, he knew more English than Spanish and had trouble keeping up in school. School became very difficult for him, and he eventually dropped out so that he could begin working, a decision he now regrets. Mr. Torres would very much like to get his GED and continue his education.

As an adult, Mr. Torres eventually moved to Connecticut, where his mother was living, and has lived in Connecticut for the past 16 years. In 2002, Mr. Torres married his first wife and had two sons together, now ages 9 and 12. The couple eventually divorced, but remain on amicable terms. In 2011, Mr. Torres married his current wife, Carmen Torres. Mr. Torres and his wife experienced some struggles in their marriage due largely to tension surrounding their different parenting styles and issues related to step-parent/step-children relations, but the couple attend marriage counseling and were able to work through their issues. Carmen Torres describes her husband as a "family man," who has a "big heart." PSR ¶ 66. Both Miguel and Carmen were very involved in their church community. Miguel enjoyed playing drums for the church's musical ministry. See Exhibit B (photographs). Importantly, while Carmen does not condone Mr. Torres' criminal conduct, she has decided to continue to support Mr. Torres. In her letter to the Court, she wrote, "With this I am not justifying only stating that everyone is entitled to another chance in life to make things better and to avoid repeating our sins or offenses. My husband has recognized that he failed . . . I support him 100%." See Exhibit C (letter to Court from Carmen Torres). In her interview with the Probation Office, Carmen was very frank: "She

recalled feeling as though she wanted to tell him 'it was over' and 'you are dead to me . . . .' When she finally was able to see him, he appeared to her as a broken man, staring at his feet. She took this as a spiritual sign that he knew the wrongfulness of his actions and had been broken and humbled by the experience. . . .[R]ather then ending their marriage, this experience has made it much stronger . . . ." PSR ¶ 67.

Mr. Torres has a consistent, demonstrated work history. His work has been primarily in the areas of warehouse and forklift operator positions. More recently, Mr. Torres worked as a security guard. He has consistently worked hard and earned an income to support his family. Mr. Torres would like to earn his GED and learn a trade, such as automotive repair or carpentry, so that he can work in those fields upon his release from prison.

Since his arrest and incarceration on August 30, 2013, Mr. Torres has been held in solitary confinement for his protection. His mental health condition has deteriorated over the last 21 months, and he is now experiencing symptoms of depression and anxiety for which Wyatt has prescribed medication. Mr. Torres' physical appearance has also diminished due in part to lack of opportunities to leave his cell for exercise or outdoor activities and in part due to decreased shower and hygiene opportunities in light of his status. Mr. Torres has received death threats while incarcerated, which were at first of a more generalized nature, but have now become more specific and repeated.

In spite of the hardships of his incarceration, Mr. Torres has maintained a generally positive outlook. He has exhibited a strong desire to rehabilitate himself and genuinely wants to participate in vocational training and mental health counseling. He speaks to his wife on the telephone whenever he is permitted telephone calls, and prior to his move to Wyatt, he visited with his wife every weekend on Saturday and Sunday. He continues to read his Bible and religious literature while held in solitary confinement.

## II. Nature and Circumstances of Offense

Mr. Torres pled guilty to a one-count Information, charging him with using an interstate facility to persuade a minor to engage in unlawful sexual activity, in violation of 18 U.S.C. § 2422(b). The

offense is obviously very serious, and nobody, including Mr. Torres, argues otherwise. In comparison to other offenses of this nature, however, Mr. Torres' offense may be seen as relatively less serious than other defendants who appear before the Court in similar cases, because there is one victim rather than multiple victims; he did not publish or distribute the videos received from the victim; and there was no actual sexual contact between Mr. Torres and the victim.[1] In addition, the period of offense conduct spanned from June 2013 to August 2013, a relatively discrete three-month period.

Mr. Torres has acknowledged that this is a serious offense and has demonstrated remorse. See Exhibit A ("I am greatly remorseful for all of the actions I have committed; from all of my heart I am remorseful."). He has been cooperative and helpful with law enforcement authorities. From the outset of the investigation and his arrest, he gave voluntary statements incriminating himself, and when asked about his conduct, he immediately told investigators what had happened. Mr. Torres also consented to the search and seizure of his phone.

In addition, Mr. Torres has written a letter of apology to the victim in this case. The letter has been provided to counsel for the government to make available to the victim should the victim wish to read it.

Following the disclosure of the first draft of the Pre-Sentence Report and following the deadline for objections and defense counsel's submission of an objection letter, the government suggested that the Probation Officer include in the PSR information concerning an allegation made against Mr. Torres 16 years ago in 1999. Those allegations are contained in paragraph 28. Mr. Torres objects to the inclusion of paragraph 28 because it contains allegations of un-convicted conduct that are unreliable and therefore should not be considered by the Court. We are not in a position to re-litigate an allegation made 16 years ago, which is part of the problem inherent in considering un-convicted conduct. Although the Court can consider almost any information about a defendant's history and characteristics, that information must at least be reliable in order to meet fundamental Due Process standards. The

[1]There is evidence that Mr. Torres and the victim kissed on the lips or cheek one time, and that conduct specifically forms the basis of the state charges against Mr. Torres.

information contained in paragraph 28 is not reliable. More importantly though, regardless of whether the Court ultimately deems it to be appropriate for inclusion in the PSR, the Court should give the information very limited weight. Mr. Torres denied the allegation in 1999 and elected to proceed to trial. No trial was ever held in the matter, because the complainant failed to show up for court and then disappeared. The case was dismissed. Accordingly, the complainant's statements were never subject to cross-examination and were not made under penalty of perjury. In addition, the complainant in that case had a potential bias, because at the time of the complaint, Mr. Torres was involved in a relationship with the complainant's mother that ended on poor terms. There are other circumstances that suggest that the 1999 allegations lack reliability. First, Mr. Torres has demonstrated that when he is guilty of wrongdoing, he takes responsibility for it and admits his conduct and shows remorse. In this case, Mr. Torres was extremely cooperative from the initial suggestion of criminal wrongdoing and essentially helped law enforcement to make the case against him. This is in contrast to the 1999 allegations at which time, Mr. Torres maintained his innocence, pled not guilty, and sought to go to trial. Second, the fact that there have been no other complaints made about Mr. Torres in the 16 years following the 1999 allegations and the fact that even the conduct in the current case is significantly different from the conduct alleged in 1999 suggest that the Court should approach the 1999 allegations with caution. Third, in her interview with Probation, Carmen Torres stated that she was shocked by her husband's conduct in this case and that she is not aware of any similar allegations, incidents, or behavior.

## III. Argument

Mr. Torres fully acknowledges that his offense is a very serious one. See Exhibit A (letter to Court from Miguel Torres). He knows that he is facing a lengthy period of incarceration and has already begun taking steps to make amends for his conduct by admitting his wrongdoing and creating a plan for the future. The question before the Court, however, is what period of imprisonment is minimally necessary to accomplish the goals of sentencing. We respectfully submit that a below-Guidelines sentence of 10 years is sufficient.

A. The applicable legal standard requires the Court to impose the sentence that is minimally sufficient to accomplish the goals of sentencing.

**1. The statutory factors and purpose of a criminal sentence.**

Pursuant to 18 U.S.C. § 3553, the Court is required to impose in each case a sentence that is "sufficient but not greater than necessary, to comply with the purposes set forth" in 18 U.S.C. § 3553(a)(2). Those purposes reflect the need for the sentence that is imposed:

(A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;

(B) to afford adequate deterrence to criminal conduct;

(C) to protect the public from further crimes of the defendant; and

(D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner[.]

18 U.S.C. § 3553(a)(2) (2009).

In determining what sentence will best achieve these purposes in each case, the sentencing court must consider the following factors:

1. The nature and circumstances of the offense and the history and characteristics of the defendant;

2. The kinds of sentences available and the applicable sentence under the Sentencing Guidelines;

3. Pertinent policy statements issued by the Sentencing Commission;

4. The need to avoid unwarranted sentence disparities among similar defendants guilty of similar conduct; and

5. The need to provide restitution to any victims.

18 U.S.C. § 3553(a)(1), (a)(3) - (a)(7) (2009).

**2. The Guidelines are not to be presumed reasonable.**

While the Court is required to consider the range of penalties suggested by the Sentencing Guidelines in determining the appropriate sentence in a given case, it is not bound by that range. See United States v. Crosby, 397 F.3d 103 (2d Cir. 2005). Indeed, the Supreme Court has repeatedly reminded sentencing courts that: **"The Guidelines are not only not mandatory on sentencing courts;**

**they are also not to be presumed reasonable."** Nelson v. United States, 129 S. Ct. 891, 892 (2009) (underlined emphases in original); see also Rita v. United States, 127 S. Ct. 2456, 2465 (2007) (emphasizing that the only "presumption of reasonableness" that applies to a Guidelines sentence is "an appellate court presumption," not applicable in the initial sentencing analysis conducted by the District Court). Thus, while the Court must consider the recommendations of the advisory Guidelines, the Court may not presume that those recommendations are reasonable. Instead, the Court must treat the recommended Guidelines sentence as only one among numerous factors.

Indeed, sentencing courts are free to disagree with the Guidelines' recommended sentence in any particular case, and may impose a different sentence based on a contrary view of what is appropriate under § 3553(a). This includes the freedom to disagree with "policy decisions" of Congress or the Sentencing Commission that are contained in the Guidelines. See Pepper v. United States, 131 S. Ct. 1229, 1241 (Mar. 2, 2011) ("[O]ur post-Booker decisions make clear that a district court may in appropriate cases impose a non-Guidelines sentence based on a disagreement with the Commission's views . . . . That is particularly true where, as here, the Commission's views rest on wholly unconvincing policy rationales not reflected in the sentencing statutes Congress enacted."); Spears v. United States, 129 S. Ct. 840, 843 (2009) (confirming Kimbrough's holding that courts may vary from particular guideline because of a policy disagreement with that guideline) (per curiam).

**3. The advisory Guidelines range is not binding and is not entitled to deference here.**

The Sentencing Guidelines applicable to sex offenses are astronomical. In this case, the government and the Probation Office agree that advisory Guidelines recommend a sentence of 168 to 210 months, before any departures. The offense level is increased from a base offense level of 32 by six additional levels due to various specific offense characteristics, which would necessarily apply in almost any case of this sort. We have objected specifically to the "use of a computer" enhancement, because the Second Circuit has not decided the question whether a telephone constitutes use of a computer for purposes of the USSG § 2G2.1(b)(6)(B) enhancement. The government has cited case law from other circuits holding that the enhancement applies. Beyond the technical application of this

particular enhancement, the more important issue for the Court consider, is that all of the enhancements and, indeed, the Guidelines calculations themselves are excessive in light of the circumstances.

While the Guidelines suggest a particular sentence in each case, their recommendation is just that – a suggestion. Since the Supreme Court declared a mandatory sentencing guideline system unconstitutional, and effectively rendered the Guidelines advisory, in United States v. Booker, 543 U.S. 220 (2005), a sentencing court must consider the sentencing guidelines in determining the appropriate sentence in a given case, but may not treat the guidelines as binding. See United States v. Crosby, 397 F.3d 103 (2d Cir. 2005). Indeed, as discussed above, the Supreme Court has repeatedly reminded sentencing courts that the Guidelines may not be presumed reasonable.

The strictly advisory nature of the Guidelines is particularly important in cases, like this one, applying Section 2G2, involving sexual exploitation of children. Sentencing courts are ordinarily expected to give a certain amount of deference to the judgment of the Sentencing Commission, because of its role as an expert agency. As the Supreme Court has explained:

> Congress established the Commission to formulate and constantly refine national sentencing standards. Carrying out its charge, the Commission fills an important institutional role: It has the capacity courts lack to base its determinations on empirical data and national experience, guided by a professional staff with appropriate expertise.

Kimbrough v. United States, 552 U.S. 85, 108-09 (2007). However, in some cases, the Guidelines "do not exemplify the Commission's exercise of its characteristic institutional role." Id. at 109. In such cases, where the applicable Guidelines ranges are based on Congressional dictates and not on "empirical data and national experience," the Guidelines are not entitled to the same deference, particularly when the Commission itself has expressed concern that the Guidelines ranges are unreasonable. Id. at 109.

That is precisely the case in regard to the Guidelines for child pornography offenses, as the Second Circuit held in United States v. Dorvee, 616 F.3d 174 (2d Cir. 2010), and United States v. Tutty, 612 F.3d 128 (2d Cir. 2010). Dorvee addressed the Guidelines applicable to cases involving possession and distribution of child pornography under § 2G2.2, whereas this case involved persuasion of a minor to engage in unlawful sexual activity under § 2G1.3, which cross-references to § 2G2.1, but these two Guidelines sections suffer from many of the same problems. Specifically, § 2G2.1 – like § 2G2.2 –

does "not reflect empirical analysis, but congressional mandates that interfere with and undermine the work of the Sentencing Commission." United States v. Almazan, 908 F. Supp. 2d 963, 970 (N.D. Iowa 2012). Like § 2G2.2, § 2G2.1 also recommends "enhancements that [do] not distinguish between least and worse offenders" and "enhancements for conduct present in nearly every case[.]" United States v. Jacob, 631 F. Supp. 2d 1099, 1115 (N.D. Iowa 2009). See also United States v. Price, 2012 WL 966971 at *11 (C.D. Ill. Mar. 21, 2012) (holding that § 2G2.1 "presents some of the same problems presented by § 2G2.2"); United States v. Krueger, 2009 WL 4164122 at *3 (E.D. Wis. Nov. 23, 2009) (same).

The Dorvee Court explained that the child pornography guidelines are not based on Commission research of past sentencing practices; that the ranges have ballooned ever higher as a result of Congressional mandates in direct contravention of Commission recommendations; that various enhancements apply in the vast majority of all cases; and that, in sum, these guidelines, unless carefully considered and applied, will result in substantively unreasonable sentences in many cases.

The Second Circuit began in Dorvee by observing that child pornography cases involve "a Guideline that is fundamentally different from most and that, unless applied with great care, can lead to unreasonable sentences that are inconsistent with what § 3553 requires." Dorvee, 616 F.3d at 184. Other courts had previously reached a similar conclusion. See, e.g., United States v. Riley, 655 F. Supp. 2d 1298 (S.D. Fla. 2009); United States v. Grober, 595 F. Supp. 2d 382 (D.N.J. 2008); United States v. Stern, 590 F. Supp. 2d 945 (N.D. Ohio 2008); United States v. Doktor, 2008 WL 5334121 (M.D. Fla. Dec. 19, 2008); United States v. Johnson, 588 F. Supp. 2d 997 (S.D. Iowa 2008); United States v. Noxon, 2008 WL 4758583 (D. Kan. Oct. 28, 2008); United States v. Shipley, 560 F. Supp. 2d 739 (S.D. Iowa 2008); United States v. Baird, 580 F. Supp. 2d 889 (D. Neb. 2008); United States v. Hanson, 561 F. Supp. 2d 1004 (E.D. Wis. 2008).

The Guidelines provisions embodied in Section 2G2 were not developed using the Commission's usual empirical approach based on past experience. "Instead, at the direction of Congress, the Sentencing Commission has amended the Guidelines under § 2G2.2 several times since their introduction in 1987, each time recommending harsher penalties." Dorvee, 616 F.3d at 184.

These amendments were enacted in a manner that "diverges significantly from the Sentencing Commission's typical empirical approach[.]" The same amendments, in particular, the 2003 and 2004 amendments, increased the offense levels for production offenses under § 2G2.1 as well. See U.S.S.G. Appendix C, Amendments 661 and 664. As a result, these Guidelines provisions are entitled to little deference, and much of the analysis set forth in Dorvee applies to production cases as well. See United States v. Huffstatler, 571 F.3d 620, 623 (7th Cir. 2009) (observing that challenges to validity and fairness of child pornography guidelines apply to production cases, and, in that case, that the government had conceded as much); cf. Spears v. United States, 555 U.S. 261, 266 (2009) (confirming that sentencing courts may vary from Guidelines on policy grounds).

The Third Circuit has summarized the history of § 2G2.2, and concluded:

> As described in the Commission's 2009 Report, and as discussed by the Second Circuit in Dorvee, and, by now, numerous district courts, § 2G2.2 was not developed pursuant to the Commission's institutional role and based on empirical data and national experience, but instead was developed largely pursuant to congressional directives. As one district court put it, "the Commission probably did the best it could under difficult circumstances, but to say that the final product is the result of Commission data, study, and expertise simply ignores the facts." Diaz, 720 F. Supp. 2d 1039, 1045 (E.D. Wis. 2010).

United States v. Grober, 624 F.3d 592, 608 (3d Cir. 2010) (internal citations and footnote omitted).

The most recent significant changes to **both** § 2G2.1 and § 2G2.2 were dictated by Congress in the PROTECT Act of 2003. "Notably, the Sentencing Commission was neither informed nor consulted on the passage of these changes, and the legislative history surrounding them offered no study or empirical justification for them." Dorvee, 616 F.3d at 185, n.7. In fact, a former United States Attorney cited by the Dorvee Court described the PROTECT Act's directives to the Commission as the "most significant effort to marginalize the role of the Sentencing Commission . . . since the Commission was created by Congress." Id.

In this case, the base offense level under § 2G2.1 is dramatically affected by the 2003 and 2004 Guidelines amendments. Under the 2002 Guidelines manual, the base offense level for this offense would have been 27. See U.S.S.G. § 2G2.1(a) (Nov. 2002). Now it is five levels higher at 32.

This Court must consider the advice of the Guidelines in fashioning an appropriate sentence. But the Court should also consider that in this context, that advice was born of politics and fear and emotion, rather than empirical study and rational analysis. As such, the Court should treat the Guidelines with less deference.

**4. The parsimony clause**

In determining an appropriate sentence, the sentencing court must apply the "parsimony clause" set forth in 18 U.S.C. § 3553(a), which provides that the Court "shall impose a sentence sufficient, but not greater than necessary" to comply with the purposes of sentencing. The Second Circuit explained in United States v. Ministro-Tapia, 470 F.3d 137 (2d Cir. 2006), that if the Court believes a lower sentence will be as effective as a higher sentence in serving the purposes of sentencing, it must choose the lower sentence. See id. at 142 (stating that where a Guidelines sentence is "in equipoise with [a] below-the-range sentence," the parsimony clause requires imposition of the lower sentence).

B. A below-Guidelines sentence of 10 years' incarceration is appropriate in this case.

In addition to the arguments concerning the Guidelines themselves, there are circumstances in this case that are "of a kind or to a degree not adequately taken into consideration by the Sentencing Commission." 18 U.S.C. § 3553; USSG § 5K2.0. Mr. Torres asks the Court to exercise its discretion under Booker and Crosby and impose a sentence consistent with the dictates of 18 U.S.C. § 3553 that is less than the sentence recommended by the advisory guidelines. There are six bases for this request.

**1. Mr. Torres' lack of criminal history and the concept of incremental punishment justify imposition of a below-Guidelines sentence.**

As reflected in the PSR, prior to his incarceration in this case, Mr. Torres has never been convicted of any crime and was never incarcerated before. PSR ¶¶ 47-48. He has now been incarcerated for approximately 21 months. The Probation Office has suggested that the Court may wish to vary downward based upon Miguel Torres' lack of criminal convictions and previous incarceration. See PSR ¶ 106 ("Mr. Torres has no prior criminal convictions and apart from the time he has spent in pretrial detention in the instant case, he has never otherwise served a custodial term. The Court might wish to consider whether imposition of a sentence within the advisory guidelines range is more than necessary to serve the purposes of sentencing detailed at 18 U.S.C. 3553(a).") We agree.

There is authority to do so. In United States v. Mishoe, 241 F.3d 214, 220 (2d Cir. 2001), the Second Circuit stated:

> Obviously, a major reason for imposing an especially long sentence upon those who have committed prior offenses is to achieve a deterrent effect that the prior punishments failed to achieve. That reason requires an appropriate relationship between the sentence for the current offense and the sentences . . . for the prior offenses.

While the Mishoe decision principally addressed the Career Offender Guidelines, the teaching of that decision applies here. Specifically, the concept of incremental punishment is relevant to the sentencing goal of deterrence. Where an individual has never been incarcerated before, as is the case here, a sentence within the Guidelines range would be excessively severe. That is because there is no reason to believe in such an instance that a prolonged period of incarceration would be more effective than a lesser sentence, because there is no point of comparison or historical example to disprove the efficacy of a lower sentence. See, e.g., United States v. Bun, 13cr174(SRU), Judgment (dkt. # 72) (citing Mishoe and stating that "The sentence imposed represents an incremental increase that should be sufficient to serve the purposes of sentencing."); United States v. Keels, 15cr17(JCH) (imposing below-Guidelines sentence based in part on concept of incrementally proportionate sentencing philosophy).

In addition, in the Sentencing Reform Act, 28 U.S.C. § 994(j), Congress instructed the Commission to "ensure that the guidelines reflect the general appropriateness of imposing a sentence other than imprisonment in cases in which the defendant is a first offender . . . ." The Commission ignored that directive. See United States v. Germosen, 473 F. Supp. 2d 221, 227 (D. Mass. Jan. 18, 2007). In Germosen, the District Court, imposed a below-Guidelines sentence based upon aberrant behavior, lack of criminal history, and recidivism statistics from the United States Sentencing Commission. See United States v. Germosen, 473 F. Supp. 2d 221, 227 (D. Mass. Jan. 18, 2007). The court noted that "[m]inimal or no prior involvement with the criminal justice system is a powerful predictor of a reduced likelihood of recidivism." Id. (citing United States Sentencing Commission, A Comparison of the Federal Sentencing Guidelines Criminal History Category and the U.S. Parole Commission Salient Factor Score, 15 (Jan. 4, 2005), http// www.ussc.gov/publicat/RecidivismSalientFactorCom.pdf.).

For a person with no criminal convictions and no previous incarceration, a sentence of 10 years' incarceration is sufficient to serve the sentencing goals of deterrence and punishment.

**2. Mr. Torres' age justifies a below-Guidelines sentence.**

Section 5H1.1 of the Guidelines provides that age "may be relevant in determining whether a departure is warranted, if considerations based on age, individually or in combination with other offender characteristics, are present to an unusual degree and distinguish the case from the typical cases covered by the Guidelines. Age may be a reason to depart downward in a case in which the defendant is elderly and infirm and where a form of punishment such as home confinement might be equally efficient as and less costly than incarceration."

Mr. Torres is 45 years old. While he is not yet "elderly and infirm," he is much older than the average defendant who appears before the Court particularly in the case of a first conviction. More importantly, however, if the Court sentences Mr. Torres to 10 years' incarceration, he will be in his early-to-mid-50s upon release. It is highly unlikely that he will re-offend at that age.

**3. Mr. Torres' family circumstances justify a below-Guidelines sentence.**

Mr. Torres has a wife and two minor children, ages 12 and 9. Although the letter of § 5H1.6 of the Sentencing Guidelines (departure based upon family circumstances) does not apply here, principally because Mr. Torres is not the only person who could take care of his wife and children, the Court may nevertheless consider family circumstances as a consideration in imposing a non-Guidelines sentence. The Second Circuit has recognized that family ties and circumstances are grounds for a downward departure. See United States v. Johnson, 964 F.2d 124, 128-29 (2d Cir. 1992) (explaining that extraordinary family circumstances are widely accepted as a basis for departure and upholding downward departure for a single parent with three young children); United States v. Alba, 933 F.2d 1117, 1122 (2d Cir. 1991). The rationale for such a departure or variance is important. As the Johnson court explained, the rationale behind the departure is not that a defendant's family responsibilities decrease his culpability, but rather that courts should be reluctant to "wreak extraordinary destruction on dependents" who rely solely upon a defendant. Id. at 129. In other words, courts have suggested that the family circumstances departure is intended to benefit the family of the defendant, and not

necessarily the defendant herself. See, e.g., United States v. Galante, 111 F.3d 1029, 1035, 1037 (2d Cir. 1997). A sentencing court granting such a departure recognizes that there are costs to others that can outweigh any societal benefit to be gained by incarcerating the defendant. This Circuit has consistently deferred to the judgment of the district courts as to whether the circumstances of a particular case justify such a departure. See, e.g., Galante, 111 F.3d at 1029.

Mr. Torres does not attempt to excuse his conduct, but rather asks the Court to consider his family circumstances, which include two young children who will be missing their father during a formidable period of their lives. It is possible to impose a very significant period of imprisonment here while still giving Mr. Torres a chance to be present in the lives of his children in their later teenage years. His wife and children are an important part of his support system and will be an important part of his rehabilitation.

**4. Mr. Torres' traumatic upbringing justifies a below-Guidelines sentence.**

The Court should consider Mr. Torres' traumatic upbringing, specifically the trauma he suffered as a child as well as the absence of his father in his life.

Social Science literature makes clear that the effects of childhood neglect, abuse, and trauma have far-ranging consequences far beyond childhood and may extend well into adulthood, effecting not only a person's physical and mental health, but also in social relationships, education, work, and the criminal justice system. In a recent compilation entitled, "New Directions in Child Abuse and Neglect Research," social scientists had this to say about the effects of abuse and neglect:

> Abuse and neglect appear to influence the course of development by altering many elements of biological and psychological development; in other words, childhood abuse and neglect have a profound and often lasting impact that can encompass psychological and physical health, neuro-biological development, relational skills, and risk behaviors. The timing of the abuse or neglect and its chronicity clearly matter for outcomes. In particular, the more often children experience abuse or neglect, the worse are the outcomes.
>
> Across human and nonhuman primate studies, perturbations to the hypothalamic-pituitary-adrenal (HPA) "stress" system often are associated with abuse and neglect and with a range of mental and physical health problems. Abused and neglected children also show behavioral and emotional difficulties that are consistent with effects on the amygdala, a structure in the brain that is critically involved in emotion and associated with internalizing of problems, heightened anxiety, emotional reactivity, and deficits in emotional processing. A number of studies suggest that abuse

> and neglect are associated with functional changes in the prefrontal cortex and associated brain regions, often affecting inhibitory control.
>
> Specifically, children who experience abuse and neglect appear especially at risk for deficits in executive functioning that affect behavioral regulation. Abuse and neglect also increase children's risk for experiencing academic problems. The impact of abuse and neglect on relational skills likely operates at least partially through disorganized attachment to the caregiver, which in turn can be predictive of long-term problems. As a result of abusive or neglectful responses from caregivers, children are at risk for failing to develop effective strategies for regulating emotions in interactions with others. Further, abused and neglected children, like children with a history of institutional care, have problematic peer relations at disproportionately high rates. Similarly, abuse and neglect have been associated with dissociation among preschool- and elementary-aged children, as well as among adults. Long-term outcomes among adolescents and adults with a history of abuse and neglect include higher rates of alcohol abuse and alcoholism, as well as elevated rates of posttraumatic stress disorder, compared with those without a history of abuse and neglect.

See Ann Petersen, et al., New Directions in Child Abuse and Neglect Research at 5-6, available at http://www.nap.edu/catalog/18331/new-directions-in-child-abuse-and-neglect-research (2013).

In Mr. Torres' case, his history of sexual abuse, while isolated to three incidents, has been significant. The PSR describes three occasions when Mr. Torres was left alone with a babysitter who inappropriately sexually touched him. The experience was painful, embarrassing, and uncomfortable for Mr. Torres, and he acknowledged that he continues experience flashbacks. PSR ¶ 60.

In addition, Mr. Torres grew up without a father figure in his life. The absence of a steady father figure has had a profound impact upon him. PSR ¶ 56 ("Mr. Torres noted it was hurtful to him that his father was not there for him . . . ."). Studies in the area of father-absence have consistently demonstrated that lack of father involvement in a child's life leads to an overall lower level of well-being across a variety of spectrums, including intellectual functioning. See, e.g., E. Flouri and A. Buchannon, The Role of Father Involvement in Children's Later Mental Health, Journal of Adolescence 26 at 64 (2003).

There is no excuse for Mr. Torres' criminal behavior. It is clear, however, that there are underlying issues of trauma and neglect that must be addressed. Mr. Torres has expressed a willingness to engage in treatment and counseling to address his history and how it has affected his life.

**5. The severity of prison conditions to which Mr. Torres has and will be subjected justifies a below-Guidelines sentence.**

Mr. Torres was arrested by the State on August 30, 2013 and was held in state custody from that date until February 20, 2015. While in state custody, Mr. Torres was detained for the entire time in a protective custody unit, in which he was kept in isolation. He was not able to participate in any programming at the prison and was afforded only limited periods of leave from his cell. He was physically moved to federal custody on March 4, 2015. He was initially detained in the group isolation unit at Wyatt for a brief period of time before he was moved to the Segregated Housing Unit for his protection, because he was receiving death threats from other inmates. While in the Segregated Housing Unit, Mr. Torres has been held in solitary confinement and is "locked down" 23 hours a day. He has a Bible and limited religious literature to read and may listen to a radio. Otherwise, he has no ability to leave his cell, no ability to participate in any programming at the prison, and no ability to interact with other persons. Mr. Torres continues to receive death threats from other inmates on the Segregated Housing Unit, who have threatened to kill him when he is transported into Bureau of Prisons custody.[2] The time Mr. Torres has already served has been hard time, and it will continue to be hard time as long as the threats he is receiving continue.

There is authority to vary or depart downward based upon conditions of confinement and vulnerability to abuse. For example, in United States v. Lara, 905 F.2d 599, 602 (2d Cir. 1990), the Second Circuit affirmed a district court's departure based upon a defendant's particular vulnerability. The Court held: "The severity of Morales' prison term is exacerbated by his placement in solitary confinement as the only means of segregating him from other inmates. We agree with the district court that this presents an extraordinary situation that warrants considering factors ordinarily irrelevant." Id. (citations and internal quotation marks omitted).

Many defendants with charges similar to Mr. Torres can be held in group isolation units, which,

---

[2]Most of the other residents on the Segregated Housing Unit are gang members, many of whom are placed there for punishment or to be separated from other inmates. Unfortunately, placement in the Segregated Housing Unit is also the only way to protect inmates who have been threatened.

while somewhat protected from the general population, nevertheless still permit ample time out of the cell and permit some participation in prison programming. By contrast, here, Mr. Torres has been held in solitary confinement for the entire 21 months he has been imprisoned, not based solely on the nature of his charges but based upon general and specific threats he has received and based upon his particular vulnerability to those threats. Mr. Torres' mental health and physical appearance have deteriorated appreciably throughout his incarceration and in recent months have plummeted. He has been given medication by the Wyatt psychiatrist to address the anxiety and depression from which he suffers due to ongoing death threats. Prison is never meant to be pleasant, but in Mr. Torres' case it has been miserable. It is likely that some form of protective custody will be needed going forward in light of the ongoing nature of the death threats. This has and will continue to make Mr. Torres' incarceration more punitive than the average defendant, and the Court should consider that fact.

**6. The purposes of sentencing weigh in favor of a sentence of 10 years.**

Turning to the factors of 18 U.S.C. § 3553(a), the Court must impose a sentence that is sufficient, but not greater than necessary punishment for Mr. Torres' commission of this crime.

Section 3553(a)(2)(A) requires the Court to consider "the need for the sentence imposed . . . to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense." As the plain language indicates, this provision requires the Court to consider these purposes in relation to the instant offense. This was a very serious offense. The punitive effect of any sentence is not viewed in a vacuum by simple, bland reference to an offense; rather, that effect is, and must be, measured against Mr. Torres, who has no previous convictions and has never before served a period of incarceration. A sentence of 10 years would be significant for anyone, but in particular, it would be extremely severe for Mr. Torres. It will remove him from society for a significant period of time. A 10-year sentence is even more punitive for Mr. Torres because of the excessively punitive conditions to which he has been subjected, including death threats and the need to be placed in solitary confinement for his protection.

A further, overly prolonged period of imprisonment is not only unnecessary to achieve these goals but could actually be counterproductive insofar as long periods of incarceration have been shown

to increase the "criminogenic effects of imprisonment which include contact with more serious offenders, disruption of legal employment, and weakening of family ties." U.S. Sentencing Commission, Staff Discussion Paper, Sentencing Options under the Guidelines at 18-19 (Nov. 1996), available at http://www.rashkind.com/alternatives/dir_00/USSC_sentencingoptions.pdf.

As for specific deterrence, Mr. Torres has demonstrated genuine remorse for his crime and has accepted responsibility for it. Although he can never undo the terrible decision he made, he has shown insight into his conduct and is working on improving himself so that he can prevent himself from re-offending. He has demonstrated a genuine desire to engage with sex offender counseling and programs and has specifically requested to be designated to FMC Devins for that purpose. Mr. Torres desperately wants to improve himself and is open to training, working hard, and receiving mental health and sex offender counseling.

As for general deterrence, any sentence available to the Court here will serve the goal of general deterrence because even a sentence of 10 years is severe and sends a strong message to the community. Moreover, it is not clear that the severity of a sentence (as opposed to the certainty of the imposition of some sentence) has any significant general deterrent value. In a recent study of drug offenders sentenced in the District of Columbia, researchers tracked over a thousand offenders whose sentences varied substantially in terms of prison and probation time. Donald P. Green & Daniel Winik, Using Random Judge Assignments to Estimate the Effects of Incarceration and Probation on Recidivism Among Drug Offenders, 48-2 Criminology 357 (2010). The results showed that "incarceration seems to have little net effect on the likelihood of subsequent rearrest." Id. at 381. "Those assigned by chance to receive prison time and their counterparts who received no prison time were re-arrested at similar rates over a four-year time frame." Id. at 382. Typical of the findings on general deterrence are those of the Institute of Criminology at Cambridge University. See Andrew von Hirsch, et al, Criminal Deterrence and Sentence Severity: An Analysis of Recent Research (1999). The report, commissioned by the British Home Office, examined penalties in the United States as well as several European countries. It examined the effects of changes to both the *certainty* and the *severity* of punishment. While significant correlations were found between the certainty of punishment and crime rates, the

"correlations between sentence severity and crime rates . . . were not sufficient to achieve statistical significance." The report concludes that "the studies reviewed do not provide a basis for inferring that increasing the severity of sentences generally is capable of enhancing deterrent effects."

The last statutory factor, the goal of rehabilitation, requires both educational and vocational training, as well as mental health counseling. Mr. Torres is open to both. In his letter to the Court, he writes, "Please designate me to a prison that can give me opportunities for education, work and programs that can help with sex offenses. I ask for these programs to better my life. I want to be a family man, a hard worker, and improve my future through the benefits that you provide me." Exhibit A (letter to Court from Miguel Torres). Moreover, in his PSR interview, Mr. Torres expressed an interest in receiving whatever counseling programs will be available to him while confined. PSR ¶ 75. The PSR author has noted that "[t]o Mr. Torres's credit, he appears to be focused on using the time he will spend in confinement to complete his GED, engage in vocational training and participate in whatever treatment programs are available. He does appear to want to participate in a sex offender treatment program and gain insight into his own actions in the offense." PSR ¶ 110. Rehabilitation also requires an ability to return to life in the community after a significant but not overly prolonged period of imprisonment. Rehabilitation will be more effective if Mr. Torres continues to be able to rely upon his support system, which includes his wife and children.

**IV. Conclusion**

Accordingly, for all of the reasons discussed above, Mr. Torres respectfully requests that the Court impose the mandatory minimum sentence in this case – 10 years' incarceration. He also requests that the Court recommend that he be designated to FMC Devins and that he receive all available vocational and educational training, as well as counseling. We request that the Court make explicit in the written judgment that it is the Court's intention that Mr. Torres receive credit for all time served since his arrest on August 30, 2013.

Respectfully submitted,

THE DEFENDANT,
Miguel Torres

Dated: May 15, 2015

/s/ Kelly M. Barrett
Kelly Barrett
Asst. Federal Defender
265 Church Street, Suite 702
New Haven, CT 06901
Bar No. Ct27410
(203) 498-4200
Email: kelly.barrett@fd.org

CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on May 15, 2015, a copy of the foregoing MEMORANDUM IN AID OF SENTENCING was filed electronically. Notice of this filing will be sent to all parties by operation of the Court's electronic filing system or by mail to anyone unable to accept electronic filing as indicated on the Notice of Electronic Filing. Parties may access this filing through the Court's CM/ECF System.

/s/ Kelly M. Barrett
Kelly M. Barrett